# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN DOE,<br><br>                              Plaintiff,<br><br>           v.<br><br>KEYSTONE FIRST; KEYSTONE FAMILY<br>HEALTH PLAN; VISTA HEALTH PLAN;<br>BLUE CROSS AND BLUE SHIELD<br>ASSOCIATION,<br><br>                              Defendants. | Case No. <u>24-374</u> |

## **COMPLAINT**

Plaintiff, John Doe, by and through his undersigned counsel, Justin Robinette, Esquire, hereby submits and files the instant Complaint against Defendants, Keystone First; Keystone Family Health Plan; Vista Health Plan; Independence Blue Cross; and Blue Cross and Blue Shield Association, averring in support thereof, as follows:

## **THE PARTIES**

1.     Plaintiff, John Doe (hereinafter "Plaintiff" or "Mr. Doe") is a citizen and resident of the Commonwealth of Pennsylvania, residing at ███████████████████████████████████████████████, Philadelphia, Pennsylvania.  On the same date as the filing of this Complaint, Plaintiff has filed for the Court's consideration Plaintiff's Motion to Proceed Anonymously, and to redact his home address from the pleadings.

2.     Defendant, Keystone First, is a private health insurance company, and/or private health insurance plan, with its headquarters and principal place of business located at 200 Stevens

1

Drive, Philadelphia, PA 19333.

3.      Defendant, Keystone Family Health Plan, is a private health insurance company, and/or private health insurance plan, with its headquarters and principal place of business located at 200 Stevens Drive, Philadelphia, PA 19333.

4.      Defendant, Vista Health Plan, is a private health insurance company, and/or private health insurance plan, with its headquarters and principal place of business located at 200 Stevens Drive, Philadelphia, PA 19333.

5.      Defendant, Blue Cross and Blue Shield Association (hereinafter "Blue Cross"), is a health insurance company with its headquarters and principal place of business located at 200 E. Randolph St., Chicago, IL 60601.

6.      At all times relevant hereto, the Defendants acted by and through each of their respective agents, employees, and/or other representatives, in the course and scope of employment, and in furtherance of the business interests of the Defendants.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the parties and claims pled herein pursuant to 28 U.S.C. § 1331.

8.      This Court has supplemental jurisdiction over related state law claims pled herein pursuant to 28 U.S.C. § 1367(a).

9.      This Court has jurisdiction over Defendants because Defendants' contacts with this state and judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in International Shoe Company v. State of Washington, 326 U.S. 310 (1945), and its progeny.

10.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## MATERIAL FACTS

11.     Mr. Doe is a transgender man.

12.     "Gender identity" is a clear and well-established medical concept that refers to one's internal sense of oneself as having a particular gender.

13.     Although many people who are designated female at birth based on external anatomy identify with the female gender, there are also people who do not identify with the sex that was assigned to them at birth. Transgender men are men who were assigned "female" at birth but have a male gender identity and transgender women are women who were assigned "male" at birth but have a female gender identity.

14.     There are people who are transgender who experience feelings of incongruence between their gender identity and the sex they were assigned at birth, and experience distress as a result of that incongruence, which are symptoms of gender dysphoria ("GD").

15.     Gender dysphoria is a serious medical condition codified in the *Diagnostic and Statistical Manual of Mental Disorders 5* (DSM-5) and *International Classification of Diseases* (ICD-10).

16.     GD is a medical and therapeutic diagnosis "associated with clinically significant distress or impairment in social, occupational, or other important areas of functioning" for a person who is transgender. *See Diagnostic and Statistical Manual of Mental Disorders*, 5th Ed. ("DSM-V" at 302.85); *see also* Coleman, E., *et al*., Standards of Care for the Health of Transgender and Gender Diverse People, Version 8, *International Journal of Transgender Health*, 23(S1), S1-S260 (2022);

17.     The widely accepted standards of care for treatment of gender dysphoria are published

by the World Professional Association for Transgender Health ("WPATH").  The

WPATH Standards of Care have been recognized as the authoritative standards of care

by leading medical organizations, the U.S. Department of Health and Human Services,

Federal courts, and the Pennsylvania Department of Human Services.

18. Under the WPATH standards, medically necessary treatment for gender dysphoria may

require gender-affirming surgical procedures, medical treatments, and related

procedures, to alleviate the symptoms of gender dysphoria.

19. According to every leading major medical organization and the overwhelming

consensus among medical experts, treatment of gender dysphoria, including surgical

procedures, medical treatments, and related procedures, are effective, safe, and

medically necessary when clinically indicated to alleviate gender dysphoria.

20. According to United States District Judge Timothy J. Savage's recent Opinion in Doe v.

Independence Blue Cross, No. 23-1530, Dkt. 41 (Nov. 21, 2023) (Savage, J.), the

medical-necessity determination must be made based on the claimant's internal sense of

their gender—their gender identity—not on external markers of gender—their gender

expression.  What matters is how Plaintiff identified himself for purposes of Defendants'

coverage determination.

21. At all times relevant hereto, Plaintiff was diagnosed with gender dysphoria.  Plaintiff is a

transgender person who has been diagnosed with gender dysphoria.

22. The substantial limitation on Plaintiff's interaction with others is characterized on a

regular basis by severe problems in social and occupational functioning.

23. Plaintiff was clinically diagnosed with GD and has clinically significant distress

associated with being transgender.

24. Plaintiff is substantially limited in the major life activities of working, interacting with

4

others, social functioning, and caring for himself.

25.    At all times relevant hereto, Defendants issued and had in place for the Plaintiff a policy

of health insurance (hereinafter "the Policy" or "the subject Policy") to insure Plaintiff

for health insurance.  A true and correct copy of the Policy is attached hereto as Exhibit

"A."

26.    At all times relevant hereto, Defendant insured Plaintiff for expenses and costs related to

Plaintiff's healthcare.

27.    At all times relevant hereto, Plaintiff complied with all terms and conditions of the

subject Policy.

28.    Beginning in 2018, Defendants did not cover all of Plaintiff's transgender-related

gender-affirming surgical procedures, medical treatments, and related procedures and/or

treatments.

29.    Beginning in 2018, Defendants did not permit Plaintiff to engage out-of-network non-

participating providers for all of his gender-affirming surgical procedures, medical

treatments, and related procedures and/or treatments.

30.    Defendant denied Plaintiff's claims on grounds that "medical necessity has not been

established."

31.    After one such denial was made originally on the basis that medical-necessity was not

allegedly established, when medical necessity was established, and the discriminatory

denial was eventually overturned, the same procedure was then denied on grounds that

the out-of-network nonparticipating provider had not fully disclosed the risks of the

procedure to Plaintiff, however, the out-of-network non-participating provider had fully

explained the risks of the procedure to Plaintiff, again, an incorrect decision which was

also eventually overturned.

32.   It is believed and, therefore, averred that Defendants made several pretextual coverage decisions, denying Plaintiff's legitimate claims, for coverage of gender-affirming care and treatment, constituting a form of discrimination against Plaintiff based on sex, gender identity, gender stereotyping, and/or based on disability (gender dysphoria).

33.   Defendants did not initially cover Plaintiff's transgender-related surgical procedures, medical treatments, and related procedures and/or treatments, on account of discrimination against Plaintiff, placing obstacle after obstacle in front of Plaintiff on his transition journey, in hopes of intimidating Plaintiff and making Plaintiff simply go away.

34.   Beginning in or around 2018, Plaintiff sought coverage for electrolysis on the left forearm for hair removal which is a precursor to radial forearm phalloplasty.

35.   Plaintiff expended approximately $2,942.00 for hair removal prior to the phalloplasty that was never repaid by Defendants.

36.   Plaintiff's electrologist attempted in writing and over the telephone to get Keystone First representatives to cover the services or provide approval for an in-network alternative that would be covered to no avail.  Plaintiff was forced to expend the medical costs associated with electrolysis.

37.   In or around July 30, 2018, Plaintiff underwent the first phase of gender-affirming surgery to create a penis, Stage I phalloplasty.

38.   It was not until the second gender-affirming surgery, glansplasty, in or around November 2018, that Plaintiff first discovered that the Keystone First nonparticipating providers were not actually paid for their prior services during the Stage I phalloplasty

procedure.

39.   In or around April 20, 2019, Plaintiff underwent fat grafting and testicular implantation.

40.   In or around August 29, 2019, Plaintiff underwent testicular implant revision and erectile device placement.

41.   It is acknowledged *some* of the procedures pre-date the decision in *Bostock v. Clayton County, Georgia*, Consolidated Case No. 17-1618, 590 U.S. ___, 140 S. Ct. 1731, 2020 WL 3146686 (U.S. June 15, 2020).

42.   However, all of Plaintiff's procedures should have been paid for, since it was still illegal in the Eastern District of Pennsylvania, even before Bostock, to discriminate against individuals on the basis of their gender non-conformity, or on the basis of gender stereotyping, in the reported decision of Ellingsworth v. Hartford Fire Insurance Company, 247 F. Supp. 3d 546 (E.D. Pa. 2017).

43.   In June 2021, Plaintiff was required to cancel a surgery he could not afford if his insurance did not pay for the same.  The procedure Plaintiff could not have performed was to have the erectile device that was not functioning properly taken out and replaced with another device.

44.   Before the surgery, Plaintiff discovered that the erectile pump supplier would be charging $11,000.00 for the pump, and that the charge would not be covered by Keystone First, and therefore, Plaintiff could not undergo medically-necessary surgery at that time to replace the erectile pump device.

45.   The pump needs to be replaced in Plaintiff's specific case because the first pump is placed too close to the surface of Plaintiff's skin.  Plaintiff's pubic mound is perpetually pumped up in a way that is extremely uncomfortable and sometimes painful.

46.     Defendants' discriminatory refusal to pay for the erectile pump replacement caused Plaintiff to experience physical pain and suffering.

47.     Further, with a penis that is not fully functional, Plaintiff is being required to maintain sex characteristics of his sex assigned at birth that are not congruent with his gender identity and which caused and continue to cause severe emotional distress.

48.     There is peer-reviewed literature regarding the devastating consequences of having a penis without full function.

49.     Plaintiff was effectively forced to live in this way, and is continuing to be effectively forced to live in this way, it is respectfully submitted, because Keystone First did not pay Keystone First nonparticipating providers for Plaintiff's prior services.

50.     Defendants' discriminatory refusal to pay for the erectile pump replacement caused Plaintiff to experience severe emotional distress.

51.     Plaintiff's gender dysphoria was exacerbated by the discriminatory acts committed by Defendants.

52.     Plaintiff has suffered severe emotional distress for which he is entitled to compensatory damages.

53.     It is a form of sex discrimination to require a person who is transgender to maintain sex characteristics of their sex assigned at birth.

54.     To relieve his pain, Plaintiff has tried contacting Defendants so that Defendants will pay the out-of-network nonparticipating providers.

55.     Despite contacting Defendants for Defendants to pay the out-of-network nonparticipating providers, Defendants have not paid the out-of-network nonparticipating providers.

56.    Plaintiff has expended significant amounts of his own funds from 2018 through the present for gender-affirming surgeries, medical treatments, and/or related procedures and/or treatments, which were not paid by Defendants, because out-of-network non-participating providers were unable to bill Defendants for services.

57.    Plaintiff has been forced to suffer and to expend large sums of money to relieve his pain and suffering which were not paid by insurance when those amounts should have been paid by insurance.

58.    Defendants discriminated against Plaintiff by refusing to pay for gender-affirming surgeries, medical treatments, and related procedures and/or treatments, as part of Defendants' health plan.

59.    Defendants discriminated against Plaintiff on the basis of Plaintiff's gender identity, on the basis of gender, based on gender stereotyping, and on the basis of disability.

60.    As a direct and proximate result of Defendants' unlawful and intentional discriminatory acts toward Plaintiff, Plaintiff has sustained economic and non-economic harms and damages.

61.    Defendants caused Plaintiff to suffer economic hardship as Plaintiff is unable to afford medically-necessary surgeries, medical treatments, and/or related procedures and/or treatments.

62.    Plastic surgery procedures for comparators, individuals who have suffered disfigurement from a car accident, or breast augmentation for patients diagnosed with cancer, are not considered cosmetic, and are considered covered services.  Plaintiff is therefore similarly situated but was discriminated against on account of his gender identity.

63.   The gender-affirming surgeries, medical treatments, and related procedures and/or medical treatments, which Plaintiff sought to have paid by Defendants, constituted medically-recognized standard-of-care medical treatments for a transgender person suffering from gender dysphoria ("GD").

64.   Defendants' decision was taken in conscious or reckless disregard of Plaintiff's Federally-protected rights.

65.   There is actually a larger amount of medical expenses which were not paid by Defendant, but which were written off, by the out-of-network nonparticipating providers.  It is contended that the amounts were written off because Defendant was discriminating against Plaintiff on account of his transgender status by refusing to pay for the gender-affirming surgeries, procedures, and related treatments.

66.   Further, in order to receive medically-necessary treatments for his gender dysphoria, at the present time, Plaintiff is being required to pay $30,000.00 by the out-of-network nonparticipating providers, for his prior surgeries, procedures, and related treatments— the amount written off and actually paid, under Moorhead v. Crozer Chester Medical Center, 765 A.2d 786 (Pa. 2001), although the cost of the surgeries is significantly higher, approximately $140,000.00.

67.   It is solely because Keystone First out-of-network nonparticipating providers have not been paid by Keystone First for the previous gender-affirming surgeries and procedures that Plaintiff is being denied medically-necessary care and treatment for his gender dysphoria ("GD").

68.   Additionally, it is believed and, therefore, averred that there is a Medicaid/MediCal lien to be asserted, in this case, in the amount of $81,136.89.

69.     Together with the $30,000.00, the Medicaid/MediCal lien to be asserted, in this case,

        requires Plaintiff to pay $101,136.89, which constitutes a form of crushing medical debt,

        and which is requiring Plaintiff to continue to undergo pain and suffering, humiliation

        and embarrassment, loss of enjoyment of life and life's pleasures, and emotional

        distress, because he suffered and is continuing to suffer pain on account of the erectile

        pump being too close to the surface of Plaintiff's skin, being denied medically-necessary

        care and treatment, and relief, and is being required to maintain natal sex characteristics

        with respect to a gender with which he no longer identifies, on account of crushing

        medical debt unpaid by Defendants due to discrimination against Plaintiff due to

        Plaintiff's gender identity, based on gender stereotyping, and/or based on Plaintiff's

        disability (gender dysphoria).

70.     Additionally, Plaintiff paid $581.04.00 himself, out-of-pocket, which was ultimately

        reimbursed—by the facility, because Plaintiff was being discriminated against by

        Defendant, in the denial or refusal of Defendants to pay Plaintiff's legitimate claims, on

        account of discrimination due to Plaintiff's gender identity, based on gender

        stereotyping, and/or based on Plaintiff's disability (gender dysphoria).  However, it is

        believed and, therefore, averred, that there would also be a lien asserted for this amount

        in this case.

71.     It is solely because Keystone First out-of-network nonparticipating providers have not

        been paid by Keystone First for the previous gender-affirming surgeries and procedures

        that Plaintiff is being required to maintain sex characteristics which do not correspond

        with his sex assigned at birth constituting a form of sex discrimination.

72.     Plaintiff approximates that he has paid $61,250.00 for various procedures out-of-pocket

to date.

73.    Plaintiff also recalls that he expended money for hand therapy in San Francisco, California which was not covered by Keystone First—five (5) sessions at approximately $1,500.00.

74.    Medications, vitamins, and supplies were also not paid for by Keystone First totaling approximately $3,000.00.

75.    Plaintiff faced barriers to his access to care on account of discrimination and he was required to spend additional sums of money in attempts to secure the services that were not paid for by Defendants, including flights, lodging accommodations, caretaking services, and a driver, to wit:

76.    For Stage 1 phalloplasty, flights for Plaintiff and four (4) caretakers totaled $2,500.00.

77.    For Stage 1 phalloplasty, lodging for Plaintiff plus (1), at $250.00 per day, for forty-five (45) days, totaled $11,250.00.

78.    For Stage 1 phalloplasty, a daily specialized caretaker and a driver, for $100.00 per day, for forty-five (45) days, totaled $4,500.00.

79.    For glansplasty and fat grafting, flights for Plaintiff plus (1), totaled $1,000.00.

80.    For glansplasty and fat grafting, lodging for $250.00 for ten (10) days, totaled $2,500.00.

81.    For glansplasty and fat grafting, a daily specialized caretaker and a driver, for $100.00 per day, for five (5) days, totaled $500.00.

82.    For testicular implants, flights for Plaintiff plus (1), totaled $1,000.00.

83.    For testicular implants, lodging for $250.00 for fifteen (15) days, totaled $3,750.00.

84.    For testicular implants, a daily specialized caretaker and a driver, for $100.00 per day,

for seven (7) days, totaled $700.00.

85. For the erectile device, flights for Plaintiff plus (1), totaled $1,000.00.

86. For the erectile device, lodging for $250.00 for eighteen (18) days, totaled $4,500.00.

87. For the erectile device, a daily specialized caretaker and a driver, for $100.00 per day, for eighteen (18) days, totaled $1,800.00.

88. Plaintiff saw a psychiatrist approximately two (2) months after canceling the gender-affirming surgery to correct the placement of the erectile pump, caused by Defendants' discriminatory acts.

89. Weekly therapy with several different therapists runs $150.00 per week for 125 weeks and so far has totaled $18,750.00.

90. Defendants' discriminatory refusal to pay for Plaintiff's surgeries, medical treatments, and/or related procedures and/or treatments, caused Plaintiff to maintain sex characteristics with which he did not identify, exacerbating his gender dysphoria and causing him severe emotional distress.

91. It is respectfully submitted that in January 2022, Plaintiff underwent a marital separation, caused in part by the discriminatory acts committed by Defendants, of requiring Plaintiff to maintain sex characteristics with which he did not identify.

92. Plaintiff has asked his providers if they can please look for slightly imperfect or example pumps which may cost less, however, Plaintiff is entitled to the same standard-of-care medical treatments, and to have those treatments covered and paid for by insurance, on the same terms as Plaintiff's similarly-situated cisgender counterparts, and free from unlawful discrimination.

## CLAIMS FOR RELIEF

### COUNT I:
### DISCRIMINATION BASED ON SEX IN VIOLATION OF SECTION 1557 OF THE AFFORDABLE CARE ACT, 42 U.S.C. § 18116
### (PLAINTIFF, JOHN DOE v. DEFENDANTS, KEYSTONE FIRST; KEYSTONE FAMILY HEALTH PLAN; VISTA HEALTH PLAN; BLUE CROSS AND BLUE SHIELD ASSOCIATION)

93.    Doe restates and realleges all previous paragraphs as though fully set forth here.

94.    Congress prohibited sex discrimination in any health care program and activity, including policies of insurance issued on behalf of health insurance companies, that includes the Defendants, at 42 U.S.C. § 18116, also known as Section 1557, the Patient Protection and Affordable Care Act, or Affordable Care Act.

95.    It is believed and therefore averred that Defendants receive Federal financial assistance, including, it is believed, for Defendants' health programs or activities, and each Defendant therefore constitutes a covered entity under Section 1557 of the Affordable Care Act.

96.    It is believed and therefore averred that each Defendant is a health insurance issuer with respect to a self-funded health plan, and is therefore a covered entity within the meaning of Section 1557 of the Affordable Care Act.

97.    Defendants each constitute an issuer of insurance products, plans, and benefits that receive Federal financial assistance for those products, plans, and benefits.

98.    Each of the Defendants constitute a "covered entity" under 45 C.F.R. § 92.4.3.

99.    42 U.S.C. § 18116 covers the Defendants as Section 18116  provides, in pertinent part, as follows:

§ 18116. Nondiscrimination.

    (a) In general.

> Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. § 18116(a).

100.    Section 1557 of the Affordable Care Act, along with its implementing regulations, at 45 CFR § 92, et seq., 81 FR 31375-473 (May 18, 2016), have adopted the ACA non-discrimination rule, which prohibits discrimination based on sex, gender identity, and gender expression, by referring to and incorporating therein the prohibitions of Title IX (20 U.S.C. § 1681) against sex discrimination including its enforcement provisions.

101.    According to 45 CFR § 92.1, "Section 1557 requires the application of the enforcement mechanisms under Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. 794) for purposes of violations of Section 1557 and this part."  45 CFR § 92.1 (Subpart A – General Provisions).

102.    45 CFR § 92.2 further provides in pertinent part:

> Except as provided in Title I of the Patient Protection and Affordable Care Act (or any amendment thereto), an individual shall not, on any of the grounds set forth in paragraph (b) of this section, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any health program or activity, any part of which is receiving Federal financial assistance (including credits, subsidies, or contracts of insurance) provided by the U.S. Department of Health and Human Services; or under any program or activity administered by the Department under such Title; or under any program or activity administered by any entity

established under such Title.

45 CFR § 92.2.

103.    Defendants were required to certify compliance with the prohibitions against sex

discrimination in 42 U.S.C. § 18116 in order to participate in the Commonwealth of

Pennsylvania's State Health Insurance Exchange, under 45 C.F.R. § 92.4:

> Assurances.
>
> (a) Assurances.  An entity applying for Federal financial assistance to which this
> part applies shall, as a condition of any application for Federal financial assistance,
> submit an assurance, on a form specified by the Director of the Department's
> Office for Civil Rights, that the entity's health programs or activities will be
> operated in compliance with section 1557 and this part.  A health insurance issuer
> seeking certification to participate in an Exchange or a State seeking approval to
> operate a State Exchange to which section 1557 or this part applies shall, as a
> condition of certification or approval, submit an assurance, on a form specified by
> the Director of the Department's Office for Civil Rights, that the health program
> or activity will be operated in compliance with section 1557 and this part.  An
> applicant or entity may incorporate this assurance by reference in subsequent
> applications to the Department for Federal financial assistance or requests for
> certification to participate in an Exchange or approval to operate a State Exchange.

45 C.F.R. § 92.4.

104.    Section 1557 provides that "an individual shall not, on the ground prohibited under

…Title IX of the Education Amendments of 1972 (20 U.S.C. 1681, et seq.)" – which

prohibits discrimination "on the basis of sex" – "be excluded from participation in, be

denied the benefits of, or be subjected to discrimination under, any health program or

activity, any part of which is receiving Federal financial assistance."  42 U.S.C. §

18116(a).

105.    The Department of Health and Human Services' ("HHS") regulations including the ACA

non-discrimination rule apply to "covered entities" and prohibit discrimination on the

basis of gender identity. 45 C.F.R. §§ 92.4, 92.207.

106.   Discrimination on the basis of gender identity, transgender status, gender transition, or gender nonconformity constitutes discrimination on the basis of "sex" under Section 1557.

107.   Doe has been wrongfully subjected to discrimination by Defendants because of sex.

108.   In June 2021, Plaintiff was required to cancel a surgery he could not afford if his insurance did not pay.  The procedure Plaintiff could not have performed was to have the erectile device that was not functioning properly taken out and replaced with another device.

109.   Before the surgery, Plaintiff discovered that the erectile pump supplier would be charging $11,000.00 for the pump, and that the charge would not be covered by Keystone First, and therefore, Plaintiff could not undergo medically-necessary surgery at that time to replace the erectile pump device.

110.   The pump needs to be replaced in Plaintiff's specific case because the first pump is placed too close to the surface of Plaintiff's skin.  Plaintiff's pubic mound is perpetually pumped up in a way that is extremely uncomfortable and sometimes painful.

111.   Defendants' discriminatory refusal to pay for the erectile pump replacement caused Plaintiff to experience physical pain and suffering.

112.   Further, with a penis that is not fully functional, Plaintiff is being required to maintain sex characteristics of his sex assigned at birth that are not congruent with his gender identity and which caused and continue to cause severe emotional distress.

113.   There is peer-reviewed literature regarding the devastating consequences of having a penis without full function.

114.   Plaintiff was effectively forced to live in this way, and is continuing to be effectively

forced to live in this way, it is respectfully submitted, because Keystone First did not

pay Keystone First nonparticipating providers for Plaintiff's prior services.

115.   Defendants' discriminatory refusal to pay for the erectile pump replacement caused

Plaintiff to experience severe emotional distress.

116.   Plaintiff's gender dysphoria was exacerbated by the discriminatory acts committed by

Defendants.

117.   Plaintiff has suffered severe emotional distress for which he is entitled to compensatory

damages.

118.   It is a form of sex discrimination to require a person who is transgender to maintain sex

characteristics of their sex assigned at birth.

119.   To relieve his pain, Plaintiff has tried contacting Defendants so that Defendants will pay

the out-of-network nonparticipating providers.

120.   Despite contacting Defendants for Defendants to pay the out-of-network

nonparticipating providers, Defendants have not paid the out-of-network

nonparticipating providers.

121.   Plaintiff has expended significant amounts of his own funds from 2018 through the

present for gender-affirming surgeries, medical treatments, and/or related procedures

and/or treatments, which were not paid by Defendants, because out-of-network non-

participating providers were unable to bill Defendants for services.

122.   Plaintiff has been forced to suffer and to expend large sums of money to relieve his pain

and suffering which were not paid by insurance when those amounts should have been

paid by insurance.

123.   Defendants discriminated against Plaintiff by refusing to pay for gender-affirming

surgeries, medical treatments, and related procedures and/or treatments, as part of Defendants' health plan.

124.   Defendants discriminated against Plaintiff on the basis of Plaintiff's gender identity, on the basis of gender, based on gender stereotyping, and on the basis of disability.

125.   As a direct and proximate result of Defendants' unlawful and intentional discriminatory acts toward Plaintiff, Plaintiff has sustained economic and non-economic harms and damages.

126.   Defendants caused Plaintiff to suffer economic hardship as Plaintiff is unable to afford medically-necessary surgeries, medical treatments, and/or related procedures and/or treatments.

127.   Plastic surgery procedures for comparators, individuals who have suffered disfigurement from a car accident, or breast augmentation for patients diagnosed with cancer, are not considered cosmetic, and are considered covered services.  Plaintiff is therefore similarly situated but was discriminated against on account of his gender identity.

128.   The gender-affirming surgeries, medical treatments, and related procedures and/or medical treatments, which Plaintiff sought to have paid by Defendants, constituted medically-recognized standard-of-care medical treatments for a transgender person suffering from gender dysphoria ("GD").

129.   Defendants' decision was taken in conscious or reckless disregard of Plaintiff's Federally-protected rights.

130.   There is actually a larger amount of medical expenses which were not paid by Defendant, but which were written off, by the out-of-network nonparticipating

providers.  It is contended that the amounts were written off because Defendant was discriminating against Plaintiff on account of his transgender status by refusing to pay for the gender-affirming surgeries, procedures, and related treatments.

131.  Further, in order to receive medically-necessary treatments for his gender dysphoria, at the present time, Plaintiff is being required to pay $30,000.00 by the out-of-network nonparticipating providers, for his prior surgeries, procedures, and related treatments—the amount written off and actually paid, under Moorhead v. Crozer Chester Medical Center, 765 A.2d 786 (Pa. 2001), although the cost of the surgeries is significantly higher, approximately $140,000.00.

132.  Additionally, it is believed and, therefore, averred that there is a Medicaid/MediCal lien to be asserted, in this case, in the amount of $81,136.89.

133.  Together with the $30,000.00, the Medicaid/MediCal lien to be asserted, in this case, requires Plaintiff to pay $101,136.89, which constitutes a form of crushing medical debt, and which is requiring Plaintiff to continue to undergo pain and suffering, humiliation and embarrassment, loss of enjoyment of life and life's pleasures, and emotional distress, because he suffered and is continuing to suffer pain on account of the erectile pump being too close to the surface of Plaintiff's skin, being denied medically-necessary care and treatment, and relief, and is being required to maintain natal sex characteristics with respect to a gender with which he no longer identifies, on account of crushing medical debt unpaid by Defendants due to discrimination against Plaintiff due to Plaintiff's gender identity, based on gender stereotyping, and/or based on Plaintiff's disability (gender dysphoria).

134.  Additionally, Plaintiff paid $581.04.00 himself, out-of-pocket, which was ultimately

reimbursed—by the facility, because Plaintiff was being discriminated against by Defendant, in the denial or refusal of Defendants to pay Plaintiff's legitimate claims, on account of discrimination due to Plaintiff's gender identity, based on gender stereotyping, and/or based on Plaintiff's disability (gender dysphoria).  However, it is believed and, therefore, averred, that there would also be a lien asserted for this amount in this case.

135.   It is solely because Keystone First out-of-network nonparticipating providers have not been paid by Keystone First for the previous gender-affirming surgeries and procedures that Plaintiff is being denied medically-necessary care and treatment for his gender dysphoria ("GD").

136.   It is solely because Keystone First out-of-network nonparticipating providers have not been paid by Keystone First for the previous gender-affirming surgeries and procedures that Plaintiff is being required to maintain sex characteristics which do not correspond with his sex assigned at birth constituting a form of sex discrimination.

137.   Plaintiff approximates that he has paid $61,250.00 for various procedures out-of-pocket to date.

138.   Plaintiff also recalls that he expended money for hand therapy in San Francisco, California which was not covered by Keystone First—five (5) sessions at approximately $1,500.00.

139.   Medications, vitamins, and supplies were also not paid for by Keystone First totaling approximately $3,000.00.

140.   Plaintiff faced barriers to his access to care on account of discrimination and he was required to spend additional sums of money in attempts to secure the services that were

not paid for by Defendants, including flights, lodging accommodations, caretaking services, and a driver, to wit:

141. For Stage 1 phalloplasty, flights for Plaintiff and four (4) caretakers totaled $2,500.00.

142. For Stage 1 phalloplasty, lodging for Plaintiff plus (1), at $250.00 per day, for forty-five (45) days, totaled $11,250.00.

143. For Stage 1 phalloplasty, a daily specialized caretaker and a driver, for $100.00 per day, for forty-five (45) days, totaled $4,500.00.

144. For glansplasty and fat grafting, flights for Plaintiff plus (1), totaled $1,000.00.

145. For glansplasty and fat grafting, lodging for $250.00 for ten (10) days, totaled $2,500.00.

146. For glansplasty and fat grafting, a daily specialized caretaker and a driver, for $100.00 per day, for five (5) days, totaled $500.00.

147. For testicular implants, flights for Plaintiff plus (1), totaled $1,000.00.

148. For testicular implants, lodging for $250.00 for fifteen (15) days, totaled $3,750.00.

149. For testicular implants, a daily specialized caretaker and a driver, for $100.00 per day, for seven (7) days, totaled $700.00.

150. For the erectile device, flights for Plaintiff plus (1), totaled $1,000.00.

151. For the erectile device, lodging for $250.00 for eighteen (18) days, totaled $4,500.00.

152. For the erectile device, a daily specialized caretaker and a driver, for $100.00 per day, for eighteen (18) days, totaled $1,800.00.

153. Plaintiff saw a psychiatrist approximately two (2) months after canceling the gender-affirming surgery to correct the placement of the erectile pump, caused by Defendants' discriminatory acts.

154.    Weekly therapy with several different therapists runs $150.00 per week for 125 weeks and so far has totaled $18,750.00.

155.    Defendants' discriminatory refusal to pay for Plaintiff's surgeries, medical treatments, and/or related procedures and/or treatments, caused Plaintiff to maintain sex characteristics with which he did not identify, exacerbating his gender dysphoria and causing him severe emotional distress.

156.    It is respectfully submitted that in January 2022, Plaintiff underwent a marital separation, caused in part by the discriminatory acts committed by Defendants, of requiring Plaintiff to maintain sex characteristics with which he did not identify.

157.    Plaintiff has asked his providers if they can please look for slightly imperfect or example pumps which may cost less, however, Plaintiff is entitled to the same standard-of-care medical treatments, and to have those treatments covered and paid for by insurance, on the same terms as Plaintiff's similarly-situated cisgender counterparts, and free from unlawful discrimination.

158.    Plaintiff was directly and proximately caused by Defendants to suffer economic harms as described more fully herein on account of the Defendants' discriminatory actions and for which Plaintiff seeks economic damages.

        **WHEREFORE**, Plaintiff, John Doe, requests judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount in excess of $150,000.00, which will fully and fairly compensate Plaintiff for any and all out-of-pocket costs/expenses, medical expenses, out-of-pocket costs/expenses other than medical expenses, expenses related to travel, lodging, transportation, and accommodations, economic damages, actual damages, incidental damages, consequential damages, financial hardship, attorneys' fees, costs, and any further relief that this

Court deems just, proper, and equitable.

## COUNT II:
### DISCRIMINATION BASED ON DISABILITY IN VIOLATION OF SECTION 1557 OF THE AFFORDABLE CARE ACT, 42 U.S.C. § 18116 (PLAINTIFF, JOHN DOE v. DEFENDANTS, KEYSTONE FIRST; KEYSTONE FAMILY HEALTH PLAN; VISTA HEALTH PLAN; BLUE CROSS AND BLUE SHIELD ASSOCIATION)

159.   Doe restates and realleges all previous paragraphs as though fully set forth here.

160.   Doe has a disability, gender dysphoria, or "GD," covered within the meaning of Section 1557 of the Affordable Care Act.

161.   Congress prohibited discrimination in any health care program and activity, including policies of insurance issued on behalf of health insurance companies, on the basis of disability, that includes the Defendants, at 42 U.S.C. § 18116, also known as Section 1557, the Affordable Care Act.

162.   42 U.S.C. § 18116 provides, in pertinent part, as follows;

§ 18116. Nondiscrimination.

(a) In general.

Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), *or section 794 of title 29 [the Rehabilitation Act],* be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments).

42 U.S.C. § 18116(a) (emphasis added).

163.   According to 45 CFR § 92.1, "Section 1557 requires the application of the enforcement mechanisms under Title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.),

Title IX of the Education Amendments of 1972 (20 U.S.C. 1681 <u>et seq.</u>), the Age

Discrimination Act of 1975 (42 U.S.C. 6101 <u>et seq.</u>), and Section 504 of the

Rehabilitation Act of 1973 (29 U.S.C. 794) for purposes of violations of Section 1557

and this part." 45 CFR § 92.1 (Subpart A – General Provisions).

164. Defendants were required to certify compliance with the prohibitions against

discrimination based on disability as set forth in 42 U.S.C. § 18116 in order to participate

in the Commonwealth of Pennsylvania's State Health Insurance Exchange, under 45

C.F.R. § 92.4:

> <u>Assurances.</u>
>
> (a)  Assurances.  An entity applying for Federal financial assistance to which this part applies shall, as a condition of any application for Federal financial assistance, submit an assurance, on a form specified by the Director of the Department's Office for Civil Rights, that the entity's health programs or activities will be operated in compliance with section 1557 and this part.  A health insurance issuer seeking certification to participate in an Exchange or a State seeking approval to operate a State Exchange to which section 1557 or this part applies shall, as a condition of certification or approval, submit an assurance, on a form specified by the Director of the Department's Office for Civil Rights, that the health program or activity will be operated in compliance with section 1557 and this part.  An applicant or entity may incorporate this assurance by reference in subsequent applications to the Department for Federal financial assistance or requests for certification to participate in an Exchange or approval to operate a State Exchange.

45 C.F.R. § 92.4

165. The Department of Health and Human Services ("HHS") regulations including the ACA

non-discrimination rule apply to "covered entities" and prohibit discrimination on the

basis of actual or perceived disability.  45 C.F.R. §§ 92.4, 92.207.

166. Defendants each constitute a "covered entity" under 45 C.F.R. § 92.4.3.

167. Doe has been wrongfully been subjected to discrimination by Defendants because of

disability (gender dysphoria).

168.    Doe has been wrongfully subjected to discrimination by Defendants because of sex.

169.    In June 2021, Plaintiff was required to cancel a surgery he could not afford if his insurance did not pay.  The procedure Plaintiff could not have performed was to have the erectile device that was not functioning properly taken out and replaced with another device.

170.    Before the surgery, Plaintiff discovered that the erectile pump supplier would be charging $11,000.00 for the pump, and that the charge would not be covered by Keystone First, and therefore, Plaintiff could not undergo medically-necessary surgery at that time to replace the erectile pump device.

171.    The pump needs to be replaced in Plaintiff's specific case because the first pump is placed too close to the surface of Plaintiff's skin.  Plaintiff's pubic mound is perpetually pumped up in a way that is extremely uncomfortable and sometimes painful.

172.    Defendants' discriminatory refusal to pay for the erectile pump replacement caused Plaintiff to experience physical pain and suffering.

173.    Further, with a penis that is not fully functional, Plaintiff is being required to maintain sex characteristics of his sex assigned at birth that are not congruent with his gender identity and which caused and continue to cause severe emotional distress.

174.    There is peer-reviewed literature regarding the devastating consequences of having a penis without full function.

175.    Plaintiff was effectively forced to live in this way, and is continuing to be effectively forced to live in this way, it is respectfully submitted, because Keystone First did not pay Keystone First nonparticipating providers for Plaintiff's prior services.

176.    Defendants' discriminatory refusal to pay for the erectile pump replacement caused

Plaintiff to experience severe emotional distress.

177. Plaintiff's gender dysphoria was exacerbated by the discriminatory acts committed by Defendants.

178. Plaintiff has suffered severe emotional distress for which he is entitled to compensatory damages.

179. It is a form of sex discrimination to require a person who is transgender to maintain sex characteristics of their sex assigned at birth.

180. To relieve his pain, Plaintiff has tried contacting Defendants so that Defendants will pay the out-of-network nonparticipating providers.

181. Despite contacting Defendants for Defendants to pay the out-of-network nonparticipating providers, Defendants have not paid the out-of-network nonparticipating providers.

182. Plaintiff has expended significant amounts of his own funds from 2018 through the present for gender-affirming surgeries, medical treatments, and/or related procedures and/or treatments, which were not paid by Defendants, because out-of-network non-participating providers were unable to bill Defendants for services.

183. Plaintiff has been forced to suffer and to expend large sums of money to relieve his pain and suffering which were not paid by insurance when those amounts should have been paid by insurance.

184. Defendants discriminated against Plaintiff by refusing to pay for gender-affirming surgeries, medical treatments, and related procedures and/or treatments, as part of Defendants' health plan.

185. Defendants discriminated against Plaintiff on the basis of Plaintiff's gender identity, on

the basis of gender, based on gender stereotyping, and on the basis of disability.

186.    As a direct and proximate result of Defendants' unlawful and intentional discriminatory

acts toward Plaintiff, Plaintiff has sustained economic and non-economic harms and

damages.

187.    Defendants caused Plaintiff to suffer economic hardship as Plaintiff is unable to afford

medically-necessary surgeries, medical treatments, and/or related procedures and/or

treatments.

188.    Plastic surgery procedures for comparators, individuals who have suffered

disfigurement from a car accident, or breast augmentation for patients diagnosed with

cancer, are not considered cosmetic, and are considered covered services.  Plaintiff is

therefore similarly situated but was discriminated against on account of his gender

identity.

189.    The gender-affirming surgeries, medical treatments, and related procedures and/or

medical treatments, which Plaintiff sought to have paid by Defendants, constituted

medically-recognized standard-of-care medical treatments for a transgender person

suffering from gender dysphoria ("GD").

190.    Defendants' decision was taken in conscious or reckless disregard of Plaintiff's

Federally-protected rights.

191.    There is actually a larger amount of medical expenses which were not paid by

Defendant, but which were written off, by the out-of-network nonparticipating

providers.  It is contended that the amounts were written off because Defendant was

discriminating against Plaintiff on account of his transgender status by refusing to pay

for the gender-affirming surgeries, procedures, and related treatments.

192. Further, in order to receive medically-necessary treatments for his gender dysphoria, at the present time, Plaintiff is being required to pay $30,000.00 by the out-of-network nonparticipating providers, for his prior surgeries, procedures, and related treatments—the amount written off and actually paid, under Moorhead v. Crozer Chester Medical Center, 765 A.2d 786 (Pa. 2001), although the cost of the surgeries is significantly higher, approximately $140,000.00.

193. Additionally, it is believed and, therefore, averred that there is a Medicaid/MediCal lien to be asserted, in this case, in the amount of $81,136.89.

194. Together with the $30,000.00, the Medicaid/MediCal lien to be asserted, in this case, requires Plaintiff to pay $101,136.89, which constitutes a form of crushing medical debt, and which is requiring Plaintiff to continue to undergo pain and suffering, humiliation and embarrassment, loss of enjoyment of life and life's pleasures, and emotional distress, because he suffered and is continuing to suffer pain on account of the erectile pump being too close to the surface of Plaintiff's skin, being denied medically-necessary care and treatment, and relief, and is being required to maintain natal sex characteristics with respect to a gender with which he no longer identifies, on account of crushing medical debt unpaid by Defendants due to discrimination against Plaintiff due to Plaintiff's gender identity, based on gender stereotyping, and/or based on Plaintiff's disability (gender dysphoria).

195. Additionally, Plaintiff paid $581.04.00 himself, out-of-pocket, which was ultimately reimbursed—by the facility, because Plaintiff was being discriminated against by Defendant, in the denial or refusal of Defendants to pay Plaintiff's legitimate claims, on account of discrimination due to Plaintiff's gender identity, based on gender

stereotyping, and/or based on Plaintiff's disability (gender dysphoria).  However, it is

believed and, therefore, averred, that there would also be a lien asserted for this amount

in this case.

196.   It is solely because Keystone First out-of-network nonparticipating providers have not

been paid by Keystone First for the previous gender-affirming surgeries and procedures

that Plaintiff is being denied medically-necessary care and treatment for his gender

dysphoria ("GD").

197.   It is solely because Keystone First out-of-network nonparticipating providers have not

been paid by Keystone First for the previous gender-affirming surgeries and procedures

that Plaintiff is being required to maintain sex characteristics which do not correspond

with his sex assigned at birth constituting a form of sex discrimination.

198.   Plaintiff approximates that he has paid $61,250.00 for various procedures out-of-pocket

to date.

199.   Plaintiff also recalls that he expended money for hand therapy in San Francisco,

California which was not covered by Keystone First—five (5) sessions at approximately

$1,500.00.

200.   Medications, vitamins, and supplies were also not paid for by Keystone First totaling

approximately $3,000.00.

201.   Plaintiff faced barriers to his access to care on account of discrimination and he was

required to spend additional sums of money in attempts to secure the services that were

not paid for by Defendants, including flights, lodging accommodations, caretaking

services, and a driver, to wit:

202.   For Stage 1 phalloplasty, flights for Plaintiff and four (4) caretakers totaled $2,500.00.

203.   For Stage 1 phalloplasty, lodging for Plaintiff plus (1), at $250.00 per day, for forty-five (45) days, totaled $11,250.00.

204.   For Stage 1 phalloplasty, a daily specialized caretaker and a driver, for $100.00 per day, for forty-five (45) days, totaled $4,500.00.

205.   For glansplasty and fat grafting, flights for Plaintiff plus (1), totaled $1,000.00.

206.   For glansplasty and fat grafting, lodging for $250.00 for ten (10) days, totaled $2,500.00.

207.   For glansplasty and fat grafting, a daily specialized caretaker and a driver, for $100.00 per day, for five (5) days, totaled $500.00.

208.   For testicular implants, flights for Plaintiff plus (1), totaled $1,000.00.

209.   For testicular implants, lodging for $250.00 for fifteen (15) days, totaled $3,750.00.

210.   For testicular implants, a daily specialized caretaker and a driver, for $100.00 per day, for seven (7) days, totaled $700.00.

211.   For the erectile device, flights for Plaintiff plus (1), totaled $1,000.00.

212.   For the erectile device, lodging for $250.00 for eighteen (18) days, totaled $4,500.00.

213.   For the erectile device, a daily specialized caretaker and a driver, for $100.00 per day, for eighteen (18) days, totaled $1,800.00.

214.   Plaintiff saw a psychiatrist approximately two (2) months after canceling the gender-affirming surgery to correct the placement of the erectile pump, caused by Defendants' discriminatory acts.

215.   Weekly therapy with several different therapists runs $150.00 per week for 125 weeks and so far has totaled $18,750.00.

216.   Defendants' discriminatory refusal to pay for Plaintiff's surgeries, medical treatments,

and/or related procedures and/or treatments, caused Plaintiff to maintain sex characteristics with which he did not identify, exacerbating his gender dysphoria and causing him severe emotional distress.

217.   It is respectfully submitted that in January 2022, Plaintiff underwent a marital separation, caused in part by the discriminatory acts committed by Defendants, of requiring Plaintiff to maintain sex characteristics with which he did not identify.

218.   Plaintiff has asked his providers if they can please look for slightly imperfect or example pumps which may cost less, however, Plaintiff is entitled to the same standard-of-care medical treatments, and to have those treatments covered and paid for by insurance, on the same terms as Plaintiff's similarly-situated cisgender counterparts, and free from unlawful discrimination.

219.   Plaintiff was directly and proximately caused by Defendants to suffer economic harms and other damages, as described more fully herein on account of the Defendants' discriminatory actions, and for which Plaintiff seeks economic and other damages.

**WHEREFORE**, Plaintiff, John Doe, requests judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount in excess of $150,000.00, which will fully and fairly compensate Plaintiff for any and all out-of-pocket costs/expenses, medical expenses, out-of-pocket costs/expenses other than medical expenses, expenses related to travel, lodging, transportation, and accommodations, economic damages, actual damages, incidental damages, consequential damages, financial hardship, attorneys' fees, costs, and any further relief that this Court deems just, proper, and equitable.

## COUNT III:
## BREACH OF CONTRACT
### (PLAINTIFF, JOHN DOE v. DEFENDANTS, KEYSTONE FIRST; KEYSTONE FAMILY HEALTH PLAN; VISTA HEALTH PLAN; BLUE CROSS AND BLUE SHIELD ASSOCIATION)

220.   Doe restates and realleges all previous paragraphs as though fully set forth here.

221.   A contract of insurance existed between Plaintiff and Defendants.

222.   Plaintiff fulfilled his part of the insurance contract by meeting all applicable terms and conditions of the policy.  See a copy of the Policy attached hereto as Exhibit "A."

223.   Defendants had a duty to consider the good faith interests of its insured as a factor in coming to the decision as to whether to cover the Plaintiff's claim.

224.   Defendants owed to Plaintiff a duty to give his interests the same faithful consideration that Defendants gave Defendants' own interests.

225.   Defendants owed a legal duty to Plaintiff, including the duty to timely investigate, evaluate, cover, and pay the claim within the policy provisions.

226.   Defendants owed a legal duty to Plaintiff to timely investigate, evaluate, cover, and pay the claim within the policy provisions.

227.   Defendants owed a legal duty to Plaintiff to timely investigate, evaluate, cover, and pay the claim on an equal and non-discriminatory basis.

228.   Defendants breached these duties by failing to pay the expenses for Plaintiff's transgender-related gender-affirming surgeries, medical treatments, and/or related procedures and/or treatments.

229.   Defendants breached these duties by their discriminatory conduct.

230.   Plaintiff was directly and proximately caused by Defendants to suffer damages including actual damages, out-of-pocket expenses, and economic damages.

**WHEREFORE**, Plaintiff, John Doe, requests judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount in excess of $150,000.00, which will fully and fairly compensate Plaintiff for any and all out-of-pocket costs/expenses, medical expenses, out-of-pocket costs/expenses other than medical expenses, expenses related to travel, lodging, transportation, and accommodations, economic damages, actual damages, incidental damages, consequential damages, financial hardship, attorneys' fees, costs, and any further relief that this Court deems just, proper, and equitable.

**COUNT IV:**
**BREACH OF CONTRACT AND OF THE DUTY OF GOOD FAITH AND FAIR DEALING**
**(PLAINTIFF, JOHN DOE v. DEFENDANTS, KEYSTONE FIRST; KEYSTONE**
**FAMILY HEALTH PLAN; VISTA HEALTH PLAN; BLUE CROSS AND BLUE**
**SHIELD ASSOCIATION)**

231.    Doe restates and realleges all previous paragraphs as though fully set forth here.

232.    At all times relevant hereto, Defendant issued and had in place for the Plaintiff a policy of health insurance (hereinafter "Plaintiff's Policy") to insure Plaintiff for health insurance.

233.    Plaintiff complied with all terms and conditions of the subject Policy. See a copy of the Policy attached hereto as Exhibit "A."

234.    Plaintiff fulfilled his part of the contract.

235.    At all times relevant hereto, Plaintiff fully cooperated with Defendant in the handling of his claims.

236.    The insurance policy imposed certain contractual and other duties on Defendant. See Exhibit "A."

237.    The insurance contract included within it a covenant of good faith and fair dealing, which is included in every contract of insurance in Pennsylvania.

238.    Defendant owed the Plaintiff a duty to evaluate his claim in good faith, on a non-

discriminatory basis, and within the applicable policy provisions.

239.   Defendant owed the Plaintiff a duty to protect and look out for Plaintiff's interests.

240.   Plaintiff relied upon and reasonably believed that Defendant would fulfill its contractual

obligations and duties.

241.   Plaintiff reasonably believed that Defendant would protect his interests pursuant to the

obligations contained in the insurance policy and would not place Defendant's interests

ahead of the Plaintiff's.

242.   Based upon the facts pleaded above, immediately below, and in the other counts set forth

in this Complaint, Defendant breached Defendant's contractual obligations with the

Plaintiff by:

    a.    Failing to pay Plaintiff's claims;

    b.    Failing to pay for Plaintiff's transgender-related gender-affirming surgeries,

        medical treatments, and/or related procedures and/or treatments.

    c.    Failing to pay Plaintiff's claims in a timely manner;

    d.    Failing to cover and/or pay the claims within a reasonable period of time;

    e.    Jeopardizing the financial security of Plaintiff with full knowledge that

        Defendants' actions were causing such a result;

    f.    Failing to properly evaluate Plaintiff's claims;

    g.    Failing to timely process Plaintiff's claims;

    h.    Conducting an investigation, evaluation and assessment with the purpose

        and effect of protecting and serving Defendants' own interests, rather than

        providing proper and faithful consideration to the Plaintiff's interests;

i.       Creating and implementing unlawful and inadequate policies, guides, procedures and practices with regard to claims investigations and claims handling;

j.       Failure to adhere to Defendants' policies, guides, procedures, and practices with regard to claims investigations and claims handling;

k.      Implementing and pursuing a claims handling/litigation policy and strategy with the design and purpose of deterring claims rather than protecting the interests of their insureds;

l.       Failure to timely and adequately communicate with Plaintiff;

m.     Breaching known legal duties to the Plaintiff out of financial self-interests;

n.      Considering improper and impermissible criteria in the evaluation of Plaintiff's claims;

o.      Failing to train claims handling personnel properly;

p.      Failing to obtain qualified personnel;

q.      Exhibiting a pattern and practice of engaging in unfair or deceptive acts or practices to benefit the interests of Defendant to the detriment and expense of the Plaintiff.

243.   Defendants have failed to make payment pursuant to the policy, which has caused Plaintiff to expend large sums of monies in attempts to alleviate his gender dysphoria through medically necessary procedures that have been unlawfully denied coverage by the Defendants.

244.   As a direct and proximate result of Defendants' breach of its contractual duties and legal obligations of good faith as described above, Plaintiff suffered significant damages,

including, but not limited to actual damages, out-of-pocket costs and expenses, incidental damages, consequential damages, economic damages, attorneys' fees and costs, and financial hardship.

245.   Plaintiff was directly and proximately caused by Defendants to suffer damages on account of the Defendants' illegal and discriminatory bad-faith insurance practices.

246.   All of Plaintiff's losses were solely and proximately caused by the actions and conduct of the Defendants, without any contribution, negligence, want of action, or other wrongdoing by the Plaintiff.

**WHEREFORE**, Plaintiff, John Doe, requests judgment in favor of Plaintiff and against Defendants, jointly and severally, in an amount in excess of $150,000.00, which will fully and fairly compensate Plaintiff for any and all out-of-pocket costs/expenses, medical expenses, out-of-pocket costs/expenses other than medical expenses, expenses related to travel, lodging, transportation, and accommodations, economic damages, actual damages, incidental damages, consequential damages, financial hardship, compensatory damages for pain and suffering, emotional distress, punitive damages, attorneys' fees, costs, and any further relief that this Court deems just, proper, and equitable.

## JURY DEMAND

Plaintiff hereby requests a trial by jury of eight (8) members on all counts so triable.

Respectfully submitted,

DATED: 01/25/2024          BY:    */s/ Justin Robinette, Esquire*
                                  Justin Robinette, Esquire (I.D. # 319829)
                                  P.O. Box 15190
                                  Philadelphia, PA 19130-9998
                                  Tel: (267) 595-6254
                                  Fax: (267) 592-3067
                                  justin@jrobinettelaw.com

## **CERTIFICATE OF SERVICE**

I, <u>Justin Robinette, Esquire</u>, attorney for the Plaintiff in the above captioned matter,

hereby certify that a true and correct copy of the foregoing document was filed with the Court

and served together with the Court-issued Summons by personal service/hand delivery to each

Defendant on the date set forth below, or as soon thereafter as service can be effectuated.

Respectfully submitted,

DATED: <u>01/25/2024</u>            BY:    *<u>/s/ Justin Robinette, Esquire</u>*
                                              Justin Robinette, Esquire
                                              *Attorney for Plaintiff*